IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2024

## STATE OF TENNESSEE v. JARMIE ALONZO HILL

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-1898    Steve R. Dozier, Judge**

_____

**No. M2023-01592-CCA-R3-CD**

_____

The Defendant, Jarmie Alonzo Hill, whose first trial with a codefendant before a Davidson County Criminal Court jury ended in a mistrial, was convicted in a second Davidson County Criminal Court bench trial of aggravated assault with serious bodily injury. The Defendant raises three issues on appeal: (1) whether the trial court erred by not *sua sponte* recusing itself based on a prejudicial finding it made against the Defendant in the codefendant's unrelated drug case; (2) whether the State committed a *Brady* violation by not providing the Defendant with the transcript of an unavailable witness's jury trial testimony until the first day of the retrial; and (3) whether the evidence was sufficient to sustain the conviction. Based on our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN W. CAMPBELL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Tamika Parker, Nashville, Tennessee, (at trial and on appeal), for the appellant, Jarmie Alonzo Hill.

Jonathan Skrmetti, Attorney General and Reporter; Lacey E. Wilbur, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jenny Charles, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

## FACTS

On the morning of April 28, 2017, sixty-five-year-old Robert Gray was accosted in his Nashville driveway by two men who forced him inside his home, demanded his money, beat him, handcuffed him, strangled him, stabbed him in the neck, and fled with his wallet and cash from his safe. Approximately one week later, the victim identified his assailants as two men he had repeatedly seen around the neighborhood, Lamichael Nicholas Good and the Defendant. Both men were arrested and indicted for especially aggravated kidnapping, aggravated robbery, employing a firearm during the commission of a dangerous felony, and aggravated burglary.

The State dismissed the firearm count against the Defendant prior to the Defendant's and Codefendant Good's September 2017 jury trial. At the conclusion of that trial, the jury acquitted Codefendant Good of the firearm count of the indictment. The jury was unable to reach unanimous verdicts on any of the remaining counts of the indictment, and a mistrial was declared. The State subsequently agreed to amend count two against the Defendant to aggravated assault with serious bodily injury and to dismiss the other two counts against the Defendant in exchange for the Defendant's agreeing to a bench trial.

### State's Proof

The State's first witness at the Defendant's May 31-June 1, 2023, retrial was Sergeant Lee Davis of the Metropolitan Nashville Police Department ("MNPD"), who responded to the crime scene shortly after 1:00 p.m. on April 28, 2017. He testified that when he arrived, two registered nurses who happened to be in the area were rendering aid to the victim, who was wearing only his boxer shorts and lying in his front yard with his hands handcuffed behind his back. The victim had "quite a bit of trauma to his face and neck area[,]" with contusions and lacerations to his nose and neck. The only description that Sergeant Davis was able to get from the barely conscious victim was that his assailants were two black men with dreadlocks. The victim "also mentioned . . . a . . . black car." Sergeant Davis testified that he removed the victim's handcuffs with a standard handcuff key and cleared the house to ensure that there were no suspects or other victims inside. He found no one inside the home.

On cross-examination, Sergeant Davis testified that the victim's home appeared "to be in disarray" with "a significant amount of blood" on the floor in some of the rooms. When asked if he secured the dog, he responded that he did not know anything about a dog.

The seventy-one-year-old victim identified photographs of his Second Avenue South home and testified that on April 28, 2017, he lived there with his wife, daughter and grandson, but his daughter was in the process of moving out. He said his first cousin,

Reggie Johnson, lived next door. The victim stated that he and Mr. Johnson took the victim's grandson to school that morning. He said he returned home at 9:00 or 9:30 a.m., went inside to put a steak on the stove, and then went back outside to retrieve his cell phone, which he had left in his vehicle. As he was reaching into his vehicle, the Defendant "came up on [him]." The next thing he knew, Codefendant Good came through the hedges to join the Defendant. At that point, the Defendant grabbed the victim and told him that they were going to rob him. The victim testified that he recognized both men as soon as he saw them.

The victim testified that he did not at first see the Defendant's weapon, but after the men forced him into his home, he saw that the Defendant had a small axe or hatchet "stuck down in his pants." He said that Codefendant Good had a gun "wrapped up in a . . . long towel." Once inside, both men began beating him "like a dog." The victim said that he was also stabbed three times in the neck and choked with some kind of cord. He did not remember what the men used to stab him. On a scale of one to ten, the victim rated his pain level as ten.

The victim testified that as the men were forcing him inside, they asked if anyone else was present in the home. When he answered "no[,]" one of the men responded, "[I]f there is, we gonna kill them." The victim stated that he had some money in a "little safe" hidden in his basement. He identified photographs of his basement and testified that it was accessible only through an outside door at the bottom of some steps. He said the men were beating him so badly that he told them about the money in the safe, and that they then took him into the basement to retrieve it. He stated that he was unable to open the safe, and that the men opened it in the victim's daughter's bedroom, using the axe that the Defendant had brought.

The victim testified that he eventually lost consciousness. When he came to, his hands were handcuffed behind him, he was bleeding badly, and he was wearing only his boxer shorts. The victim stated that he slowly crawled from his daughter's bedroom to his sitting room, where he was able to use a footstool to finally get to his feet. Because "Gunsmoke" was playing on his television, he estimated that it was approximately 12:15 or 12:20 p.m. He said he backed up to his front door to open it, exited his house, and fell in the front yard. He testified that he was taken to Vanderbilt Hospital, where he was hospitalized for three or four days and underwent throat surgery that required him to have a feeding tube for almost two months.

The victim thought it was on his second day of hospitalization that he told an interviewing detective that he did not know his assailants. He told the detective he did not know who they were because he feared the Defendant and his codefendant would hurt his family. Approximately a week later, after he had been released from the hospital, he informed the detective that he knew the men. The victim recalled that while he was

- 3 -

hospitalized, he provided a general description of his assailants as two black men with dreadlocks, both between thirty-five and forty-years-old and each approximately 5'10" in height. He also recalled having described the vehicles involved as a black BMW and a red Dodge Charger. The victim testified that, prior to April 28, 2017, he had seen the Defendant in a black BMW and Codefendant Good in a red car.

The victim testified that he knew Codefendant Good from the neighborhood and estimated that he had seen him fifteen to twenty times or more prior to April 28, 2017. He said he knew Codefendant Good by both his full name and as "Mike Good," which was what he called him. He was also familiar with the Defendant from having seen him twenty to thirty times around the neighborhood. He knew the Defendant's last name was Hill but did not know his first name. The Defendant called him "Unc[,]" short for uncle, and he called the Defendant by the Defendant's nickname, which he could no longer recall. The victim testified that he first met the Defendant when he noticed a funeral taking place at the church across the street, saw the Defendant exit the church, and asked the Defendant whose funeral it was. He said the Defendant responded that it was his grandmother's funeral. The victim stated that he knew the Defendant's grandfather, Joe Hill, very well because he was a deacon in the church and the victim had mowed grass and done other work for him. He said it was from Deacon Hill that he eventually learned the Defendant's real name.

The victim testified that on May 10, 2017, he identified Codefendant Good and the Defendant as his assailants to Detective Kevin Keating, who came to his house that day. He said he did not know the Defendant's real name at that time but directed Detective Keating to the home of the Defendant's grandfather, which was down the street from the victim's home.

The victim testified that a friend of his, "Black," later showed him a Facebook photograph of the Defendant. He said Black's last name was Gooch, and that Mr. Gooch's uncle was the father of two of the victim's sister's children. The victim identified two Facebook photographs of the Defendant that his friend had shown him and said he informed Detective Keating about them, identifying the Defendant as one of the men who had robbed him. He testified that Detective Keating showed him photographic lineups on May 18, 2017, and that he was able to identify both the Defendant and Codefendant Good from those lineups. The victim then made a positive courtroom identification of the Defendant, testifying that he was "100 percent" certain and without any doubt in his mind that the Defendant was one of the men who came into his home on April 28, 2017.

On cross-examination, the victim identified a crime scene photograph of the door leading to his basement but denied that it was nailed shut, testifying that the door could be opened. He agreed that a crime scene photograph of his bedroom showed that his bed was

- 4 -

not disturbed, there was no blood on the floor, and his gold watch was still on his nightstand. He testified that the men never took him into his bedroom, and that he did not know where in the house they searched. He acknowledged that other crime scene photographs appeared to show that his kitchen was not rummaged through, that neither his daughter's bed nor her closet were disturbed, and that his daughter's handbag, shoes, clothes, and television were still present. He further acknowledged that the television set in his sitting room was not taken. He did not know if his sofa cushions were flipped. He acknowledged that the steak he had left cooking did not cause a fire but pointed out that he had left the burner on low. He said he did not know if the steak was burned because he never got the chance to eat it.

When asked if he had difficulty remembering facts, the victim responded: "I've got a little - - a little. But I know who robbed me. I know who beat me. I know who left me for dead." Defense counsel questioned the victim at length about details in his hospital records surrounding his treatment for injuries sustained in the crime, including that hospital staff recorded that he reported heavy alcohol use. Defense counsel also questioned the victim at length about his subsequent history of having a stroke and his difficulty with memory. The victim denied that hospital staff talked to him about his drinking and said that he did not drink anything on the day of the crime. He did not recall having reported that he had drunk twelve beers the day before, testifying that he had probably had six beers. He denied that he reported that he had been drinking six beers a day for years but indicated that he would not be surprised to know that it was recorded multiple times in his hospital records. He said his drinking did not bother him and disagreed that having drunk twelve beers the day before the crime would have made it hard for him to remember or to "perceive[.]"

The victim acknowledged he had had a stroke two years prior to the retrial. He conceded that, after his stroke, his physician reported that he had difficulty keeping track of time and memories. He did not recall having testified at a June 21, 2019 bond hearing that both cars he saw had been black. He stated that he did not see the Defendant and Codefendant Good in cars that morning and did not, therefore, know if the black car visible on a neighbor's security camera had anything to do with the crime. He did not remember having been interviewed by a private investigator, Vincent Dimps, on September 26, 2019, or having told him that the Defendant put a gun against his head. He denied that his story had evolved over time.

MNPD Detective Lukas Cantrell, who collected the victim's neighbor's security camera footage, identified two snapshots he took of the video that showed it was recorded at approximately 9:30 a.m. on April 28, 2017.

MNPD Detective Brandon Dozier testified that the 911 call about the victim was made at 12:55 p.m., and that he responded to the scene at approximately 1:10 p.m. When he entered the victim's home, he observed "a significant amount of blood on the floor of the bedroom, some blood transfer on the door frame from the bedroom to the living area and on the couch and blanket as well." He said he checked for security video and discovered that the victim's neighbor, located two doors down, had a Nest camera system with a camera mounted above her front porch. After alerting other detectives to the neighbor's security video, he went to the emergency department of Vanderbilt Hospital to talk to the victim. The victim had a cut to his neck, swelling to his face, a broken nose, a cut and swelling to the back of his head, redness on his chest, and what appeared to be a ligature mark on his neck. The victim told him that two dark-colored cars had pulled up to the front of his home, that individuals exited the passenger sides of the vehicles, and that two "male blacks, about 35 to 40 years of age" entered his home. The victim reported that the men were approximately 5'10" in height and 200 pounds and described them as muscular in build with long dreadlocks. The victim also told him that both men were armed with a gun that was about the same size as Detective Dozier's Glock 22. By the end of the interview, the victim told him that he could identify the men. Detective Dozier testified that the Defendant was arrested on July 24, 2018, in La Vergne. At the time of his arrest, the Defendant provided his phone number as 615-474-****.

On cross-examination, Detective Dozier testified that he never looked for the drivers of the cars. He agreed that his report reflected that the victim's description of the men was that they both had dreadlocks to their shoulders and that both cars were dark-colored and "up-to-date[.]" He said that the victim told him that "two male blacks came up to his location really fast, took him into the house, handcuffed him, beat him with their fists and weapons and went through his location for property." He could not recall the victim's mentioning anything about a basement or a dog or the victim's providing him with the name of either suspect. He said the victim estimated that he was incapacitated for two to three hours and thought $500 in cash and a small amount of marijuana was taken from his home. Detective Dozier could not recall the victim's mentioning anything about a pistol having been taken.

MNPD Detective Kevin Keating, the lead detective on the case, testified that he met with the victim at the victim's home on May 10, 2018. The victim told him that he knew who the perpetrators were and provided a partially correct name of "Mike Good" for Codefendant Good, along with information that Codefendant Good had recently been arrested for drug charges in Nashville. Armed with that information, Detective Keating was able to determine Codefendant Good's identity. The victim did not know the Defendant's name but told Detective Keating that the Defendant had family members who lived down the street and pointed out the house, located about a block and a half away on the corner of Second Avenue South and Cameron. Detective Keating testified that he went

to the house, wrote down the license plate numbers of vehicles parked there, searched his database, and arrived at the name Mario Hill. On May 16, he showed the victim a photographic lineup with Mario Hill's photograph and a photographic lineup with Codefendant Good's photograph. He said the victim identified Codefendant Good without any hesitation, expressing his certainty that he was the person who robbed him. The victim was unable to make any identification from the photographic lineup containing Mario Hill's photograph.

Detective Keating testified that the victim called him on May 18, 2017, to tell him that he had been "given a Facebook name of Zoe Capolo," and that he was the second individual who had robbed him. Detective Keating stated that he was able to access that Facebook account and view its posts. He identified two screenshots from that Facebook account, which he said appeared to be of the Defendant, who was using the Facebook name of Zoe Capolo and was involved in music. He testified that Mario Hill and Bridgette Hill appeared in photographs posted in the same Facebook account, and that Mario Hill appeared to be the same Mario Hill whose photograph he had placed in the photographic lineup. He said he determined that Mario Hill was the Defendant's brother, and that Bridgette Hill was the Defendant's mother. He stated that he learned the Defendant's true name by running Bridgette Hill's name through their "RMS computer database" and finding an incident report with the Defendant's name in it.

Detective Keating testified that he showed a photographic lineup with the Defendant's photograph to the victim on May 18, 2017. The victim identified the Defendant without hesitation, expressing his certainty that he was one of the men who robbed him. As part of his continued investigation, Detective Keating also obtained search warrants for cell phone numbers associated with the Defendant, including the number that the Defendant reported as his at the time of his arrest, 615-293-****. Detective Keating testified that he compared phone calls that the Defendant and Codefendant Good made while in custody and found that both men had called that number.

Detective Keating testified that he learned the Defendant had bought a 1990 black BMW model A52 on April 13, 2017, and that Codefendant Good had been stopped while driving a red Dodge Charger in February 2016. He also determined that the Defendant and Carolyn Primm were in a dating relationship. On May 21, 2017, arrest warrants were obtained for both the Defendant and Codefendant Good. Codefendant Good was arrested on June 2, 2017, and the Defendant was arrested on July 24, 2018. Detective Keating identified the men's booking photographs, which showed that the Defendant wore his hair in dreadlocks at the time of his arrest.

On cross-examination, Detective Keating testified that he became a detective in January 2016, was a detective "for a couple of months[,]" "went back to patrol for ten

months or so[,]" and then became a detective again in early 2017. He stated that he would be surprised to learn that there was nothing in his employment records to reflect that he had been a detective prior to eleven days before he was assigned to the instant case. Defense counsel questioned him at some length about how he prepared and conducted the photographic lineups. Detective Keating testified that all the men in the photographic lineup included with the Defendant's photograph had similar characteristics and were facing the same direction but acknowledged that the lineup could be considered suggestive because one of the men was "looking in, [toward] the [Defendant], the target[,]" which was a detail that he had not noticed at the time he created the lineup. He stated that he did not record any statements that the victim made when viewing the lineup. He also acknowledged that the backgrounds of some of the photographs were different, and that in the photographic lineup he prepared with Mario Hill's photograph, the image of Mario Hill's face was approximately fifty percent larger than the other faces. He said he was trained by other detectives on how to conduct photographic lineups and that the police department did not provide "a certification" on how to conduct a lineup.

Detective Keating testified that he did not investigate how many siblings the Defendant had or whether he had an older brother who more closely resembled the victim's description. When asked if the victim told him that his dog helped to revive him by licking his face, he testified that it did "not ring a bell right now." He acknowledged that the victim at first said he did not know the perpetrators but later changed his story. He said he had had that happen multiple times with victims in other cases. He stated that he did not investigate the individual who provided the victim with information about the Defendant's Facebook account because the victim would not provide him with the name of that person. He acknowledged that, to his knowledge, there was no forensic evidence linking the Defendant to the crime.

Detective Keating testified that the victim's neighbor's security video showed a red Dodge car pull up and stop. He said that as the red Dodge pulled out approximately eighteen minutes later, a black BMW pulled out with it. He acknowledged that the video did not show the black BMW stopped. He conceded it was possible the driver of the BMW could have been unaware of parked vehicles in the right lane and merely pulled into the outside lane to pass them. However, "the way [he] interpret[ed] the video and the car . . . pulling out," he believed that it had been parked, which made the "most sense" based on the victim's account of having seen two vehicles. When asked if he would be surprised to learn that the victim had testified that he did not remember seeing any cars and had obtained that information from viewing the security video, he responded that it would be "very surprising." He then pointed out that the victim told the responding officers that there were two vehicles before anyone ever viewed the neighbor's security video.

- 8 -

Detective Keating testified that, during the eight years he had worked in the South Precinct, there were "probably a couple of other[ ]" similar crimes involving victims forced into their homes and tied up and robbed. He said he was unaware of a home invasion that occurred in the 1100 block of Second Avenue South on November 8, 2020, in which the suspect was a black man with dreadlocks.

After reviewing the November 8, 2020 burglary incident report, Detective Keating testified on redirect examination that the narrative section of the report did not reflect that anyone was beaten and speculated that there may not have been anyone at home during the crime. When asked to review the report again on recross-examination, he agreed that it reflected that the victim was in his bedroom at the time of the burglary. He also agreed that the report reflected that a car pulled up in front of the house, the back door was forced open, and the victim in the instant case, who lived either directly across the street or next door from the November 8, 2020 burglarized home, was listed as a witness who could identify the suspect, who was described as a black male with shoulder length dreadlocks. When shown an additional incident report, Detective Keating acknowledged that it reflected an October 5, 2020 burglary of a residence in the same block of Second Avenue South, with the victim in the instant case again listed as a witness, an axe used during the crime, and the suspect a black male in dark clothing and a bandana. On further redirect examination, Detective Keating testified that the November 8 burglary involved a "prying object[,]" and the October 5 burglary involved a pickaxe that belonged to the victim of that burglary.

Rachel Mack, a forensic scientist employed at the MNPD crime laboratory and an expert in DNA, testified that she was unable to obtain an identifiable DNA profile from any of the items submitted for analysis in the case.

Lynette Mace, an MNPD crime scene investigator who assisted in processing the crime scene on April 28, 2017, identified crime scene photographs, including of a bedroom with a large amount of blood pooled on the floor, a small safe with the door ajar, and an axe. She said they processed the scene for latent fingerprints, but she could not recall any fingerprints having been lifted. She did recall "finding what would be consistent with glove marks, a garden variety, and also a latex glove." She stated that they did not enter or process the home's basement.

Shayne Jedlicka testified that he and John Baker met in the late 1990's and became partners in a car lot located in Old Hickory. He said he was familiar with a 1990 black BMW, which he and Mr. Baker bought and sold several different times due either to the car's having been repossessed for nonpayment or the purchaser's having traded it for another vehicle. He stated that one of Mr. Baker's friends named Tom Clark eventually purchased the car, and that they later repurchased it from Mr. Clark to sell again on their

car lot. They then sold the car in April 2017 to Carolyn Primm. He stated that if Mr. Baker wrote Ms. Primm a reimbursement check for the car on June 7, 2017, he would have picked up the car just a few days prior, either in late May or early June. He recalled that he picked up the car at a market behind a service station off Haywood Lane, and that the vehicle, which was in running condition at the time it was sold, was "[n]on-running with damage to the front end[.]" Specifically, portions of the grill were missing in the right front corner, the front right fender was "caved in," and the "marker light" was missing. He identified the black car with front end damage that was visible on the victim's neighbor's security video as the same black BMW.

Detective Kevin Keating, recalled by the State, testified that he and the prosecutor went to the car lot and determined that the 1990 black BMW was sold to Carolyn Primm and the Defendant. On cross-examination, he testified that he did not investigate the number of either registered or unregistered "1990 era BMWs" in the State on April 28, 2017.

## Defendant's Proof

The victim's wife, Donna Gray, testified that at some point after her husband's attack, their home was "shot up[,]"which had never before happened in the nineteen years they had lived there. She could not recall the specific month or year it happened, but she believed it was connected with the April 28, 2017 attack. She said she had no memory of having called the police on May 2, 2017; to report someone's having run through her yard and banged on her door and her belief that it was also related to the April 28, 2017 attack.

Dr. Micheal Ferri, a psychiatrist, testified that he had a private practice in Franklin, "Insight Recovery and Wellness[,]" and regularly managed patients with addictions, including patients with alcohol addiction. His review of the victim's medical records revealed that the victim "screened positive for regular alcohol use at least . . . ten times by different … heath care professionals asking him that question." He stated that the victim's answers varied in terms of how much he regularly drank from four to five beers a day up to twelve beers a day. He said the victim reported that he had drunk twelve beers the day prior to his attack. The victim did not experience "delirium tremens or sever[e] withdrawals" during his hospitalization related to the April 28 attack. However, his liver enzymes were "elevated in a specific pattern that would indicate . . . heavy alcohol use" and his liver ultrasound showed alcoholic fatty liver disease.

Dr. Ferri testified that "there are well described patterns that happen with heavy alcohol use to someone's cognitive abilities." He said there were indications in the victim's medical records that the victim was a "poor historian," which meant that he did not give straight answers and kept changing stories. In addition, there were significant

discrepancies between what was noted in the medical records and what the victim reported to the police. Specifically, although the victim reported that he had been handcuffed and strangled, there was no indication in the medical records of any strangulation marks on his neck or ligature marks on his arms. On the other hand, the victim made no mention of having been stabbed, yet he had a penetrating neck wound, which caused Dr. Ferri to "wonder[] about his ability to recall facts."

Dr. Ferri testified that it was "within the realm of possibility" that the victim was suffering from "Wernicke's encephalopathy" and "Korsakoff's syndrome," which was brain damage and cognitive impairment "that happens from regular use of alcohol over time." He said it was characterized by "an increasing degree of retrograde and anterograde amnesia," as well as "confabulation," or the invention of memories. He stated that the victim's medical records associated with his later hospital admittance for a stroke revealed that he had been prescribed the supplemental vitamin thiamine, which was unusual, and which suggested to Dr. Ferri that "someone recognized that there was a problem and wanted him to have that supplementation to avoid further decline because of Wernicke's or Korsakoff."

Dr. Jeffery Neuschatz, a cognitive psychologist who was accepted by the trial court as an expert in the field of eyewitness identification, testified that memory is reconstructive, requiring one to organize and "fill in the gaps" after witnessing a complex event. He said that each time someone revisits a memory, the memory can change, with some details added and others subtracted, "depending on what information you are getting." For that reason, it was possible to "have memories that are confidently held" and "richly detailed" but not "actually accurate." He stated that more accurate memories were associated with a longer exposure time, lack of distraction and stress, and a short retention time, or a short time between the event and when the memory is recounted. Conversely, less accurate memories were associated with short exposure time, longer retention time, and having been under stress or having one's view blocked in some manner.

Dr. Neuschatz testified that someone's being under extreme stress at the time of an event made it more difficult for the individual to make an accurate identification. Other factors that could contribute to unreliable eyewitness identification included: "[p]ostevent suggestion[,]" or information picked up after the event; and "[u]nconscious transference[,]" or the phenomenon of mistakenly identifying as the perpetrator of a crime someone regularly seen in the vicinity of the crime who resembles the perpetrator. He thought it possible that the victim identified the Defendant as a perpetrator because the victim had seen the Defendant in the area, and the Defendant resembled the perpetrator. He testified that "people who give wrong descriptions are less accurate in their identifications." He considered the victim "very much off" in his description because he described the

perpetrators as 5'10" or 6' tall and 200 pounds, whereas the Defendant, according to the discovery materials, was 6'2" tall and 285 pounds.

Jonathan Vincent Demps, a private investigator with an investigative firm, "Master Check," testified that he interviewed the victim in his home on September 26, 2019. He could not recall the victim's mentioning anything about a basement, a dog, or a black car. After having his memory refreshed by the audiotape of the interview, he testified that the victim mentioned having been revived by his dog.

The Defendant elected not to testify and rested his case without presenting any further witnesses. The trial court took the matter under advisement, and on June 8, 2023, issued a lengthy written order finding the Defendant guilty of the offense as charged. The trial court subsequently sentenced the Defendant as a Range I, standard offender to six years' confinement, suspended immediately to four years of supervised probation due to the Defendant's having already been incarcerated for over two years prior to making bond. Following the denial of his motion for new trial, the Defendant filed a timely appeal to this court.

## ANALYSIS

### I. Recusal

The Defendant contends that the trial court erred by not *sua sponte* recusing itself given that the trial court, "two years before the jury trial and four years before the offer of a bench trial" had "found in an unrelated drug case against [Codefendant] Good" that Codefendant Good "and his co-defendant committed this crime against [the victim]." The Defendant asserts that the State never mentioned the trial court's finding in the earlier case, and that the trial court never asked whether the Defendant "was aware that the Court issued a written order concluding that [Codefendant] Good and his co-defendant assaulted [the victim]." The Defendant argues that the trial court's impartiality could reasonably be questioned given the trial court's previous ruling in Codefendant Good's drug case. The State responds that the Defendant has failed to show how the trial court's determination on an unrelated drug case involving Codefendant Good created the appearance of bias that would have required the court to recuse itself.

"A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Tenn. Sup. Ct. R.10, RJC 2.11 (A). Bases for which a judge's impartiality might reasonably be questioned include when the judge "has a personal bias or prejudice" against any of the parties, "personal knowledge of facts that are in dispute in the proceeding[,]" or "has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the

judge to reach a particular result or rule in a particular way in the proceeding or controversy." Tenn. Sup. Ct. R. 10, RJC 2.11(A)(1), (5). "[T]he test for recusal requires a judge to disqualify himself or herself in any proceeding in which a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *State v. Clark*, 610 S.W.3d 739, 744 (Tenn. 2020) (internal quotations and citation omitted). When a judge's impartiality might reasonably be questioned, recusal is warranted "[e]ven if a judge believes he [or she] can be fair and impartial." *Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009).

We agree with the State that there was nothing about the trial court's ruling in Codefendant Good's unrelated drug case that would cause a reasonable person to question the trial court's impartiality in the instant case. The record reflects that the victim in the instant case testified at Codefendant Good's April 17, 2019 sentencing hearing in the unrelated drug case. During his testimony, the victim identified Codefendant Good and the Defendant as the two perpetrators against him in the April 28, 2017 attack. On April 24, 2019, the trial court issued a written sentencing order in which it applied the enhancement factor of the defendant's history of prior convictions or criminal behavior based on Codefendant Good's prior criminal convictions and on the trial court's finding that Codefendant Good "exhibited criminal behavior on April 28, 2017 by assaulting and robbing [the victim]."

The Defendant raised the trial court's failure to recuse itself as an issue in his motion for new trial, arguing that because the Defendant and Codefendant Good "were lumped in together and viewed as a unit throughout the proceedings[,]" and the trial court found in its sentencing order that Codefendant Good was guilty of assaulting the victim without distinguishing Codefendant Good from the Defendant, "it stands to reason that the court also found that [the Defendant] was guilty of assaulting [the victim]."

Contrary to the Defendant's assertion, the trial court's sentencing order in Codefendant Good's unrelated drug case does not, either directly or implicitly, include a finding that the Defendant was guilty of assaulting the victim. Moreover, even if the trial court specifically found in the sentencing order that the Defendant and Codefendant Good engaged together in criminal behavior by assaulting the victim, "[a] judge is in no way disqualified because he tried and made certain findings in previous litigation." *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995) (citing *King v. State*, 391 S.W.2d 637, 642 (Tenn. 1965)); *see also Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994) ("Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification."). We, therefore, conclude that the trial court did not err by not *sua sponte* recusing itself.

## II. Alleged *Brady* Violation

The Defendant contends that the State committed a *Brady* violation by not providing him with a transcript of an unavailable witness's prior trial testimony until the first day of his retrial. The record reflects that John Baker, who was found by the trial court to be unavailable due to disability at the retrial, had been called as a witness for the defense at the Defendant's first trial. Mr. Baker testified that he used to own a car lot in Old Hickory and on April 13, 2018, sold a black 1990 BMW to a man and a woman. He did not recognize the Defendant but thought he recognized Carolyn Primm as one of the two purchasers of the car. He vaguely recalled that the couple expressed dissatisfaction with the car after they bought it, that he refunded the purchase price, and that the car was in a non-running condition when he picked it up. He identified a statement he had written at Ms. Primm's request in which he stated that the couple bought the vehicle on April 13, 2018, that the couple expressed their dissatisfaction with it on April 17, 2018, and that he picked the vehicle up on April 21, 2018.

On cross-examination, Mr. Baker acknowledged having been interviewed by Detective Keating and the prosecutor at his car lot but could not recall having told them that Ms. Primm had "stood in [his] face insisting she get a letter stating she did not have possession of the car[.]" After having his memory refreshed by an audio recording, he was still unable to recall Ms. Primm's having angrily demanded the letter at his car lot but said that she "came back another time up at the garage where [he] had the car parked and was rather ugly." He thought that Ms. Primm asked his son for the letter but was certain that it was he, and not his son, who wrote the letter.

Mr. Baker stated that he did not have any record of when Ms. Primm expressed dissatisfaction with the car and speculated that he may have arrived at the April 17 date from looking at the date on the reimbursement check and "back[ing] it up to the date [he] sold [the car] to her because that's all [they] had." After being asked to look at the reimbursement check, he agreed that it was dated June 7, 2017, and that the date of April 17 was nowhere written on the check. He could not recall having told Detective Keating and the prosecutor that he had "pulled [the April 17 date] out of [his] head[,]" to "get it off [his] plate." He testified, however, that he "would say that would be correct." He then acknowledged the possibility that Ms. Primm did not express dissatisfaction with the car until a date later than April 17. He further acknowledged the possibility that, as with the April 17 date, he pulled the April 21 pickup date of the car "from [his] memory" and that the car was not picked up until a later date.

The Defendant argues that his late receipt of the transcript violated *Brady* because his "counsel could not effectively use the transcripts which contained favorable evidence material to and negating [the Defendant's] guilt." The State argues that there was no *Brady*

violation, pointing out that Mr. Baker testified as a defense witness at the first trial, the Defendant was able to obtain the transcript from the court reporter, the State chose not to introduce Mr. Baker's prior testimony at the retrial, and Defendant's counsel had ample time to review the forty-eight page transcript by the second day of trial when Mr. Baker's car lot partner testified. We agree with the State.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady*, however, does not require the State to investigate for the defendant, *see State v. Reynolds*, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984), and the State's duty to disclose does not extend to information that the defense already possesses or is able to obtain or to information not in the possession or control of the prosecution or another governmental agency. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

The Defendant has failed to show that his late receipt of the transcript constituted a *Brady* violation. The transcript of Mr. Baker's trial testimony shows that the Defendant's defense counsel at the bench trial was listed as one of two defense counsel at his first trial. Defense counsel was, therefore, presumably present during Mr. Baker's trial testimony and familiar with the statements he made. The Defendant has also not explained why he could not have obtained the transcript from the court reporter himself, what information from Mr. Baker's trial testimony would have been that helpful to his defense, or how he suffered any prejudice by not receiving the transcript until the start of the retrial. We conclude that this issue is without merit.

### III. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for assault with serious bodily injury because there was insufficient proof to establish his identity as one of the two perpetrators of the crime. The State argues that the victim's identification of the Defendant as one of the perpetrators was alone sufficient to sustain the guilty verdict. We, again, agree with the State.

The verdict of a trial judge in a bench trial is entitled to the same weight on appeal as a jury verdict. *See State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App.1999). When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact

of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

To sustain the conviction, the State had to prove beyond a reasonable doubt that the Defendant intentionally or knowingly assaulted the victim, and that the victim suffered serious bodily injury as a result. Tenn. Code Ann. §§ 39-13-101, -102(a)(1)(A)(i). The Defendant does not dispute that the victim suffered serious bodily injury in an assault but contends that the evidence was insufficient to establish his identity as one of the perpetrators. The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. *State v. Thomas*, 158 S.W.3d 361, 387 (Tenn. 2005). The identification of the defendant as the perpetrator is a question for the trier of fact after considering all the relevant proof. *Id.* at 388.

Because this was a bench trial, we have the benefit of the trial court's written order explaining its verdict, which reads in pertinent part:

> The Court accredits the testimony of [the victim], whose accounts of the assault remained largely consistent over the past six years - - that [the Defendant] was one of two individuals who assaulted him in his home. [The victim] knew the individuals from prior acquaintance and was in close proximity to them during the daylight hours for at least twenty minutes. He did not identify anyone from a photo lineup in which neither defendant was pictured but identified them from the photo lineups in which they did appear. He expressed certainty in the identification of [the Defendant] and co-Defendant Good. Additionally, a unique but damaged automobile was

owned by Defendant and appeared to be captured by video at the scene and time of the incident. The appearance of this car circumstantially corroborates [the victim's] narrative. Proof also showed that [the victim] was seriously injured, requiring multi-day hospitalization and surgical interventions. The Court finds beyond a reasonable doubt that [the Defendant] acted intentionally or knowingly in causing serious bodily injury to the victim. Thus, the Court finds that Defendant Hill is guilty of Count Two.

In addition to asserting that he was convicted "solely on the word of [the victim] and suggesting that the trial court failed to give adequate weight to inconsistencies in the victim's testimony and the lack of forensic evidence tying him to the crime, the Defendant argues that the trial court "apparently discredited the evidence presented by defense experts to explain why the physical evidence failed to align with [the victim's] memory of events despite [the victim's] 100% certainty of identifying [the Defendant]."

We respectfully disagree. The trial court reviewed in detail the evidence presented at trial, including the lack of forensic evidence linking the Defendant to the crime and the testimony of the defense experts regarding the potential effects of acute alcoholism on memory and cognition and the factors affecting an accurate eyewitness identification. The trial court also noted the corroborating evidence presented by the State that the Defendant owned the same type of car, with the same distinctive front-end damage, that was visible on the neighbor's security video at the approximate time the crime was committed. Viewed in the light most favorable to the State, the evidence was more than sufficient to establish the Defendant's identify as one of the two perpetrators of the crime. We, therefore, affirm the Defendant's conviction.

## **CONCLUSION**

Based on our review, we affirm the judgment of the trial court.

_____

JOHN W. CAMPBELL, SR., JUDGE